IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

NATHANIEL JACKSON,

                              Plaintiff,

            v.                          Civil Action No.
                                        9:01-CV-379 (GLS/DEP)

LEONARD PORTUONDO, Superintendent,
Shawangunk Correctional Facility, *et al.*,

                              Defendants.

_____

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFF:

NATHANIEL JACKSON, *Pro Se*

FOR DEFENDANTS:

HON. ELIOT SPITZER           JEANETTE RODRIGUEZ-MORICK, ESQ.
Attorney General of the State   Assistant Attorney General
of New York
The Capitol
Albany, New York  12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

_____ REPORT AND RECOMMENDATION

        Plaintiff Nathaniel Jackson, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action

pursuant to 42 U.S.C. § 1983, alleging violation of various of his constitutional rights arising out of incidents occurring at the facility in which he was housed at the relevant times.  Plaintiff's claims, which have been narrowed as a result of an earlier determination granting, in part, a pre-answer dismissal motion interposed by the defendants, stem from an array of diverse conditions and occurrences over a period spanning from April of 1996 until at least January, 2001, and are asserted against various employees of the New York State Department of Correctional Services ("DOCS").

Currently pending before the court is a motion by those defendants remaining in the action seeking the entry of summary judgment dismissing the balance of plaintiff's claims on a variety of bases.  In their motion, defendants argue that plaintiff's claims fail to implicate any legally cognizable constitutional right and, in certain instances, that Jackson has not sufficiently demonstrated their personal involvement in the violations alleged.  Defendants also seek dismissal of plaintiff's claims on the basis of qualified immunity.

Based upon a careful review of the record, considered in a light most favorable to the plaintiff, I recommend that defendants' motion be

granted.

I.    BACKGROUND

At the times relevant to his claims, plaintiff was a New York State prison inmate entrusted to the custody of the DOCS, and confined within the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York.  Plaintiff asserts that during the time of his confinement at Shawangunk he was subjected to certain conduct and occurrences arising to a level of constitutional significance extending over a significant period of time, and involving diverse matters.  For organizational purposes, I have grouped plaintiff's claims into four distinct categories.

A.    Religious Denial Claims

From April, 1996 until October, 2001 defendants are alleged to have stymied Jackson's efforts to practice Judaism, his chosen religion.  In support of this claim plaintiff asserts that defendants Portuondo, Annetts, Harris, Squillace and Goodman failed to provide him with a kosher diet consistent with his Jewish religion, resulting in his having been functionally deprived of food for nineteen days.  Amended Complaint (Dkt. No. 15) ¶¶ 20, 23.  Plaintiff asserts that this denial was in contravention of a prior agreement entered into by him with those defendants.  *Id.*

3

Additionally, plaintiff avers that although he requested permission from defendants Annetts, Harris, and Goodman to attend Jewish religious services, those requests were denied.  *Id.* ¶ 21.

In further support of his religious free exercise claim, plaintiff alleges that on October 10, 2000 defendant Goodman issued a memorandum instructing defendants Squillace and Gorelick to preclude him from participating in or receiving any privileges afforded to other Jewish inmates during the Seven Day Succoth Holiday, beginning on October 13, 2000.  *Id.* ¶ 42.  Plaintiff maintains that he wrote to defendants Portuondo, Gorelick, Squillace and Goodman twice to complain regarding this restriction, and also to request an accommodation allowing him to "properly practice" the Hanukkah holiday, but that those requests were denied.  *Id.* ¶ 43.

Plaintiff also contends that beginning on October 13, 2000 and extending throughout the duration of his confinement in the Shawangunk special housing unit ("SHU"), he was forced to use a razor to shave his facial hair, in violation of his religious beliefs.[1]  Amended Complaint (Dkt. No. 15) ¶¶ 40-41.  Although plaintiff allegedly informed defendants

---

[1]       Plaintiff also claims that use of the razor caused him an allergic reaction. Amended Complaint (Dkt. No. 15) ¶¶ 40-41.

4

Portuondo, Gorelick, Connelly and Goodman of his concerns over this matter, he received no relief.  Amended Complaint (Dkt. No. 15) ¶¶ 40-41.

On December 22, 1995 plaintiff commenced an action pursuant to 42 U.S.C. § 1983 in this court against then-Shawangunk Superintendent Louis M. Mann and several other DOCS workers, alleging deprivation of his civil rights.  *Jackson v. Mann*, No. 9:95-CV-1838 (TJM/GJD) (N.D.N.Y., filed Dec. 22, 1995).  In his complaint in that action, as amended on February 2, 1996, *see* 9:95-CV-1838, Dkt. No. 5, plaintiff asserted deprivation of his First Amendment right to freely exercise his chosen religion, advancing many of the same claims now raised in this action.  Shortly prior to commencement of a scheduled trial, at which plaintiff was represented by assigned, *pro bono* counsel, the matter was resolved, and a settlement agreement was entered into.[2]  *See* 9:95-CV-1838, Dkt. Nos. 132, 133.  Under that agreement, which was placed upon the record, plaintiff's remaining claims in that action were resolved in

---

[2]        Based upon the issuance of a report and recommendation in that case by United States Magistrate Judge Gustave J. DiBianco, and approved by District Judge Thomas J. McAvoy, a motion by defendants for summary judgment dismissing plaintiff's complaint was initially granted, and judgment was entered closing the cases. 9:95-CV-1338, Dkt. Nos. 70, 73.  That judgment, however, was reversed, in part, by the United States Court of Appeals for the Second Circuit, and the matter was remanded for trial, limited to Jackson's First Amendment free exercise cause of action. *Id.*, Dkt. No. 81; *see Jackson v. Mann*, 196 F.3d 316 (2d Cir. 1999).

return for payment by the defendants of $5,000 to the plaintiff, and

$10,000 to his assigned attorney.  *See* Brown Decl. (Dkt. No. 81) Exh. F,

at 3.

    B.    <u>Due Process Claims</u>[3]

Plaintiff was issued a misbehavior report on June 22, 1998, charging

him with several infractions, including assault on staff (Rule 100.11),

possession of drugs (Rule 113.25), refusal to obey a direct order (Rule

106.10), disregard of a command for a search or frisk (Rule 115.10), and

interference (Rule 107.10).  Cunningham Decl. (Dkt. No. 81) ¶¶ 4-5 &

Exh. A.  That misbehavior report resulted from plaintiff's refusal of an

order to remove his sneakers, coupled with the subsequent discovery of

contraband hidden in those sneakers as well as Jackson's attempt to

dispose of the contraband by flushing it down a toilet.  *See* Cunningham

Decl. (Dkt. No. 81) Exh. A, at 4-5.  Subsequent testing of the seized

contraband confirmed it to be an illicit drug.  *Id.*

A Tier III hearing was convened on or about June 25, 1998, with

defendant Robert Cunningham, then a senior correction counselor at

---

[3]    Certain of plaintiff's due process claims relate to mail watches and resulting misbehavior reports discussed elsewhere in this portion of my report.  *See* pp. 8-15, *post.*

Shawangunk, presiding as the assigned hearing officer.[4]  Cunningham

Decl. (Dkt. No. 81) ¶¶ 3-4 & Exh. A.  At that hearing Jackson admitted all

charges except for assault on staff (Rule 100.11), waived his right to

assistance, and failed to call any witnesses.  Cunningham Decl. (Dkt. No.

81) ¶¶ 9, 12; *id.* Exh. A, at 1, 6; *id.* Exh. D, at 3-5.  At the conclusion of the

hearing plaintiff was found guilty of all charges and sentenced to one year

of disciplinary confinement in the facility's SHU, with a corresponding loss

of packages, commissary and telephone privileges.[5]  Cunningham Decl.

(Dkt. No. 81) Exh. A, at 3; *id.* Exh. D, at 13; *see also* Amended Complaint

(Dkt. No. 15) ¶ 24.

C.    Attendance at Brother's Funeral

In May of 1999, plaintiff received notification that Arthur Kelly, his

brother, had died.  Annetts Decl. (Dkt. No. 81) Exh. A; Amended

---

[4]      The DOCS conducts three types of inmate disciplinary hearings.  Tier I
hearings address the least serious infractions, and can result in minor punishments
such as the loss of recreation privileges.  Tier II hearings involve more serious
infractions, and can result in penalties which include confinement for a period of time in
the SHU.  Tier III hearings concern the most serious violations, and could result in
unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v.
Squillace*, 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246
(1998).

[5]      Plaintiff attributes the disciplinary action and the resulting SHU
confinement to a belief by prison officials that he was responsible for the deaths of two
other inmates and should therefore not be allowed to remain in the general prison
population.  Amended Complaint (Dkt. No. 15) ¶ 24.

Complaint (Dkt. No. 15) ¶ 27.  After receiving notice of that death, plaintiff requested permission to attend his brother's funeral service, which was scheduled to be held on May 27, 1999 at a Brooklyn, New York funeral home.  *See* Annetts Decl. Exh. A.  That request was denied, and plaintiff was provided with a written notice of the denial signed by Shawangunk Superintendent Leonard Portuondo, informing him that the request was "[d]enied based on prior history and circumstances surrounding the death of his brother!"  *See id.* (emphasis in original).  In an affidavit given in support of defendants' motion defendant Paul Annetts, who at the relevant times was the Deputy Superintendent of Security at Shawangunk, states that the decision to deny plaintiff's request for permission to attend his brother's funeral was not made at the facility level, offering his belief that it instead emanated from the Inspector General's Office, located in Albany, New York.[6]  Annetts Decl. (Dkt. No. 81) ¶ 4.

D.    Interference with Mail

In or about July of 1999 defendant Annetts received confidential

_____

[6]      As an alternative to attending the service in person, plaintiff was permitted to view a videotape of his brother's funeral, a special accommodation which had not previously been offered to other inmates at Shawangunk.  Annetts Decl. (Dkt. No. 81) ¶ 6 & Exh. A, at 10.

information provided by an informant who had proven to be reliable in the past, suggesting that the plaintiff and others were intending "to hurt somebody". Annetts Decl. (Dkt. No. 81) ¶¶ 8-9 & Exh. B, at 3. After receiving that information Annetts made a request to Shawangunk Superintendent Portuondo for a watch of plaintiff's mail in accordance with established DOCS policy; that request was approved on the following day.[7] Annetts Decl. (Dkt. No. 81) ¶ 10 & Exh. B, at 1.

_____

[7]      Mail watches are governed by DOCS Directive #4422, which provides, in relevant part, as follows:

> III.B.8.      Outgoing correspondence shall not be opened, inspected, or read without express written authorization from the facility Superintendent.
>
> a.      The Superintendent shall not authorize the opening or inspection of such outgoing mail unless there is a reason to believe that the provisions of this or any directive or inmate rule or regulation have been violated, that any applicable state or federal law has been violated, or that such mail threatens the safety, security, or good order of a facility or the safety or well being of any person. Such written authorization by the Superintendent shall set forth specific facts forming the basis for the action.
>
> b.      If after inspecting the contents of outgoing mail it is determined that the provisions of a directive, rule or regulation, or state or federal law have been violated, or that such correspondence threatens the safety, security or good order of the facility or the safety or well being of any person, then the correspondence may be confiscated. The inmate must be informed in writing unless doing so would interfere with an ongoing investigation.

9

Responsibility for implementation of the surveillance of plaintiff's mail fell principally upon defendant Doreen Parisi, the Senior Mail and Supply Clerk at Shawangunk.  Parisi Decl. (Dkt. No. 81) ¶¶ 2-10. Consistent with Parisi's practice and the established DOCS policy, during the period in which the watch was in effect plaintiff's outgoing mail was set aside and sent to the prison's Deputy Superintendent of Security,

———————————————

> Where the inmate has been so notified, he or she may appeal the action to the Superintendent.

III.G.5.  Incoming general correspondence, other than inmate-to-inmate letters and inmate business mail, will not be read unless there is evidence that the correspondence may contain one or more of the following:

a. plans for sending contraband in or out of the facility;

b. plans for criminal activity including escape; and

c. information which, if communicated, would create a clear and present danger to the safety of persons and/or the security and good order of the facility.

III.G.6.  Written authorization from the facility Superintendent to read incoming mail must be placed in the inmate's file specifying the reasons such action is considered necessary and whether all mail or certain correspondence shall be read.  Such authorization shall be for a 60 day period subject to renewal by the Superintendent.  The Superintendent shall request documentation from the person recommending inspection to determine that there are sufficient grounds for reading the mail, that the reasons for reading the mail are related to the legitimate interests of safety, security, and order, and that the reading is no more extensive than necessary to further these interests.

Brown Decl. (Dkt. No. 81) Exh. B.

10

unopened.  *Id.* ¶¶ 8-11.  Plaintiff's incoming mail was also segregated, opened to check for contraband, and forwarded to the Deputy Superintendent of Security.  *Id.*

On August 25, 1999 defendant Kenneth Decker, at the time a corrections captain at Shawangunk tasked with reviewing confiscated mail, issued a misbehavior report to the plaintiff accusing him of conspiracy to conflict bodily harm on an inmate (Rule 100.10), the issuance of a written threat (Rule 102.10), and a correspondence procedure violation (Rule 180.11).  Decker Decl. (Dkt. No. 81) ¶ 7 & Exh. A.  That misbehavior report was based upon a letter sent by Jackson to Ms. Tanetta Watson on or about August 23, 1999, expressing his intent to cause harm to another prison inmate referred to by him only as "Jazz". *See id.*  As a result of the issuance of that report, plaintiff was placed on disciplinary confinement in the facility's SHU for seven days, and subsequently released.[8]  *See* Decker Decl. (Dkt. No. 81) ¶¶ 8-13.

On April 5, 2000 Corrections Captain Decker requested a new mail

---

[8]        According to Captain Decker, when issuing the misbehavior report he believed that a Tier III hearing would be convened to address the charges contained within it.  Decker Decl. (Dkt. No. 81) ¶ 12.  Such a hearing was not held within the required seven day time period, however, and there is no indication in the record that it was ever conducted, or that any further disciplinary action resulted from the incident.

watch for both the plaintiff and another inmate, based upon reports that plaintiff was "kiting" mail from SHU to another inmate using a third party intermediary.[9]  Decker Decl. (Dkt. No. 81) ¶ 15 & Exh. C, at 1.  That request was based upon the discovery during a random cell search of several letters in the fellow inmate's cell which appeared to be from the plaintiff, but routed using the address of a Ms. Elisa Oliver, located in Brooklyn, New York.  Decker Decl. (Dkt. No. 81) ¶ 16 & Exh. C, at 2.  Captain Decker's request was approved, and mail watches for both the plaintiff and the other inmate implicated in the violation were ordered for sixty days, effective from April 6, 2000 until June 5, 2000.  *Id.* Exh. C, at 3.  The second mail watch yielded a letter sent by the plaintiff to his girlfriend, Elisa Oliver, reflecting the same address used for the "kiting" of letters to his fellow inmate, asking her to bring him a package while he was on package restriction and soliciting her agreement to smuggle contraband into the facility.  *See* Cunningham Decl. (Dkt. No. 81) Exhs. B, C.  While that letter was sent with a notation "legal mail" included on the envelope, Elisa Oliver is not an attorney and, as such, consistent with DOCS policy

---

[9]        Kiting is a practice through which inmates send letters to persons with whom the inmate is not authorized to correspond – often inmates at the same or other facilities – using third party intermediaries.  *See United States v. Felipe*, 148 F.3d 101, 105 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1995).

that any mail not sent to a state agency, attorney, the courts, the

Commissioner of the DOCS, or any other listed entity in Directive No.

4421 is not considered confidential mail, it was not treated as legal mail,

and instead was forwarded to the office of the Deputy Superintendent for

Security, and later opened.  Parisi Decl. (Dkt. No. 81) ¶¶ 17-21*.*

The discovery of plaintiff's letter to Ms. Oliver resulted in the

issuance of a misbehavior report on June 28, 2000 by Corrections

Lieutenant A.C. Wright accusing plaintiff of smuggling (Rule 114.10), a

facility correspondence violation (Rule 180.11), and a facility packages

violation (Rule 180.12).  Cunningham Decl. (Dkt. No. 81) ¶¶ 16-17 & Exh.

B, at 7.  A Tier III hearing was convened on June 30, 2000, with

defendant Cunningham presiding, to address the charges set forth in that

misbehavior report.  *Id.* ¶ 16 & Exh. B, at 6.  At the outset of that hearing

plaintiff entered a plea of not guilty to the three violations alleged in the

misbehavior report, although he did admit writing "legal mail" on an

envelope which was not legal mail, and to requesting that someone

convey to him a package through another inmate while he was on

package restriction.  Cunningham Decl. (Dkt. No. 81) ¶ 21; *id.* Exh. B, at

6; *id.* Exh. C, at 4-5.  While plaintiff initially waived assistance with respect

13

to that hearing, *id.* Exh. B, at 6; *id.* Exh. C, at 2, he later made a request for and was provided with assistance particularly for the purpose of contacting Ms. Oliver to discuss a "sensitive topic" outside of the presence of the hearing officer.  *Id.* Exh. B, at 23-24, 27-29 & Exh. C, at 47-50.  At the conclusion of that hearing plaintiff was found guilty on all charges, and sentenced to an additional period of eighteen months of disciplinary confinement in the facility's SHU, with a corresponding loss of packages, commissary and telephone privileges.  Cunningham Decl. (Dkt. No. 81) ¶ 19 & Exh. B, at 9-10.  On appeal to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, the hearing officer's finding of guilt was affirmed, although the sentence imposed was reduced to six months of SHU confinement with a twelve month loss of other privileges. Amended Complaint (Dkt. No. 15) ¶ 37.

On or about August 20, 2000, while plaintiff was still on mail watch, a coded letter sent by the plaintiff to Elisa Oliver was interdicted and, upon decoding, determined to again be requesting the smuggling of contraband into the prison facility.  Amended Complaint (Dkt. No. 15) ¶ 38; Gorelick Decl. (Dkt. No. 81) Exh. A.  As a result, a misbehavior report was issued on August 24, 2000 by Corrections Sergeant D. Wilkins accusing plaintiff

14

of attempted smuggling (Rule 114.10) and a facility correspondence violation (Rule 180.11).  Gorelick Decl. (Dkt. No. 81) Exh. A, at 12.  A Tier III hearing was commenced on or about August 29, 2000 to address the charges set forth in that misbehavior report, with defendant Evan Gorelick, the Deputy Superintendent of Programs as Shawangunk, presiding as the hearing officer.  Gorelick Decl. (Dkt. No. 81) ¶ 4 & Exh. A, at 8.  At the outset of the hearing plaintiff waived his right to assistance, although he later reconsidered and requested aid, which was provided.  *Id.* ¶ 10; *id.* Exh. A, at 33; *id.* Exh. B, at 2, 17-20.  Based upon the evidence presented, which included the testimony of several witnesses called at plaintiff's request, the hearing officer found plaintiff guilty of both charges and imposed a sanction of one year of disciplinary confinement within the facility's SHU, with a corresponding loss of commissary, packages, telephone and recreation privileges.  *Id.* ¶¶ 6-7 & Exh. A.  That determination was later affirmed on appeal by plaintiff to Donald Selsky.[10]  Amended Complaint (Dkt. No. 15) ¶ 39.

## II.   PROCEDURAL BACKGROUND

---

[10]     Plaintiff's mail was apparently seized once again on January, 2001, and sent to defendant Annetts.  Amended Complaint (Dkt. No. 15) ¶ 44.  Neither plaintiff's complaint nor defendants' motion, however, provides any specifics regarding that mail seizure including, importantly, who was responsible for it on that occasion.

Plaintiff commenced this action on March 16, 2001, and has since been granted leave to proceed *in forma pauperis.* Dkt. Nos. 1-4. Following District Judge Lawrence E. Kahn's rejection of his first two proffered complaints (*see* Dkt. Nos. 4, 14), plaintiff successfully filed a third amended complaint on April 29, 2002. Dkt. No. 15. In that pleading plaintiff alleges, *inter alia*, 1) denial of his First Amendment right to freely exercise his chosen religion as a Jew; 2) deprivation of his Fourteenth Amendment rights to due process and equal protection; 3) violation of his Eighth Amendment right to be free of cruel and unusual punishment; and 4) that the deprivations described in his complaint were committed in retaliation for the exercise of his First Amendment right of access to the courts.

In addition to Donald Selsky, Director of Special Housing/Inmate Disciplinary Program for the DOCS as defendants, plaintiff's third amended complaint names thirteen DOCS employees stationed at Shawangunk at the time of the incidents in question, including Leonard Portuondo, Superintendent; Paul Annetts, former Deputy Superintendent for Security; Jimmie Harris, former Deputy Superintendent for Programs; Kenneth Decker, former Corrections Captain; Robert Cunningham, former

Senior Counselor; A. Goodman, a former Jewish Rabbi at the facility; Doreen Parisi, Senior Mail Clerk; Evan Gorelick, Deputy Superintendent for Programs; Daniel Connolly, Corrections Captain; A. D. Wright, Corrections Lieutenant; D. Kunze and D. Wilkins, Corrections Sergeants; and Jay Squillace, Food Service Administrator.  Dkt. No. 15.

On November 25, 2002 defendants moved seeking dismissal of plaintiff's complaint, based principally upon his failure to allege their personal involvement in the constitutional violations at issue.  Dkt. No. 14. After receiving no response on behalf of the plaintiff to that motion, I issued a report on August 8, 2003 recommending dismissal of plaintiff's claims as against defendants Connelly, Selsky and Kunze as well as dismissal of his second, fourth and sixth causes of action, but denial of the remaining portions of defendants' motion.  Dkt. No. 53.  That report and recommendation was adopted by order issued by District Judge Lawrence E. Kahn on January 13, 2004.[11]  Dkt. No. 65.

Following the entry of a routine scheduling order and pretrial discovery, the remaining defendants moved on March 15, 2005 for summary judgment dismissing plaintiff's complaint on a variety of grounds

---

[11]     Since the issuance of that order, this matter has been transferred to District Judge Gary L. Sharpe.  *See* Dkt. No. 68.

including both the alleged legal insufficiency of plaintiff's remaining claims and based upon qualified immunity.  Dkt. Nos. 81-83.  Plaintiff has since submitted papers, including a legal memorandum, in opposition to the pending motion.  Dkt. Nos. 88, 90.  Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Summary Judgment Standard

   Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for

18

purposes of this inquiry, if "it might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show,

through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.    Funeral Attendance Claims

In their motion, defendants seek dismissal of count three of plaintiff's amended complaint, which asserts deprivation of his right to procedural due process based upon the denial of his request to attend his brother's funeral.  In support of that motion, defendants argue that a prison inmate plaintiff does not possess a constitutional right to attend a relative's

funeral, nor has New York, by statute or otherwise, conferred a property

interest in such funeral attendance sufficient to trigger the procedural due

process requirements of the Fourteenth Amendment.

Cases addressing the denial of funeral attendance and death bed

visit requests by prison inmates have been analyzed under both the

Eighth Amendment and the Due Process Clause of the Fourteenth

Amendment.  Although plaintiff's claim seems to be premised principally

upon the due process clause, in light of his *pro se* status I will analyze it

under both of these provisions.

### 1.    Eighth Amendment

The conditions associated with a prisoner's confinement are subject

to the strictures of the Eighth Amendment's prohibition against cruel and

unusual punishment.  *Farmer v. Brennan*, 511 U.S. 825, 832-34, 114 S.

Ct. 1970, 1976-77 (1994).  The Eighth Amendment's prohibition of cruel

and unusual punishment encompasses punishments that involve the

"unnecessary and wanton infliction of pain" and are incompatible with "the

evolving standards of decency that mark the progress of a maturing

society."  *Estelle v. Gamble*, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290,

291 (1976); *see also Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct.

1076, 1084 (1986) (citing, *inter alia*, *Estelle*).  While the Eighth

Amendment does not mandate comfortable prisons, neither does it

tolerate inhumane treatment of prisoners; thus the conditions of an

inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer*

*v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing

*Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

To prevail, a plaintiff alleging that prison conditions violate the Eighth

Amendment must satisfy both an objective and a subjective requirement –

the conditions must be "sufficiently serious" from an objective point of

view, and the plaintiff must demonstrate that prison officials acted

subjectively with "deliberate indifference".  *See Leach v. Dufrain*, 103 F.

Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501

U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord*, No. 97-CV-1385,

1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. & Homer, M.J.);

*see also*, *generally*, *Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate

indifference exists if an official "knows of and disregards an excessive risk

to inmate health or safety; the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837,

22

114 S. Ct. at 1978; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).  In considering the types of conditions that constitute a substantial risk of harm, the court considers not only seriousness of the potential harm and the likelihood that the harm will actually occur, but additionally indications that unwilling exposure to that risk violates contemporary standards of decency, in that society does not choose to tolerate this risk in its prisons.  *Helling v. McKinney*, 509 U.S. 25, 36, 113 S. Ct. 2475, 2482 (1993).

Not every governmental action related to the interest and well-being of a prison inmate, however, demands Eighth Amendment scrutiny. *Sanders v. Coughlin*, No. 87 Civ. 4535, 1987 WL 26872, at *2 (S.D.N.Y. Nov 23, 1987) (citing, *inter alia*, *Whitley*, 475 U.S. at 319, 106 S. Ct. at 1084).  "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Id.* (quoting, *inter alia*, *Whitley*; internal quotes omitted). Conduct not intended to be punishment must consist of "more than ordinary lack of due care for the prisoner's interests or safety" to be considered cruel and unusual punishment.  *Id.*  Mere negligence in the treatment of a prisoner, without more, is not actionable under the Eighth

Amendment.  *See Farmer*, 511 U.S. at 837-38, 114 S. Ct. at 1979.

Under both New York law and the DOCS directives which control

such matters, the decision of whether to grant a death bed visit or funeral

attendance request is entrusted to the discretion of prison officials, whose

decisions in such instances are informed by sound penological

considerations.  *See* N.Y. Correction Law § 113; N.Y. DOCS Directive No.

4206 (included as Brown Decl. (Dkt. No. 81) Exh. C).  In this instance it

appears that the authority conferred under N.Y. Correction Law § 113 to

address plaintiff's request was delegated either to Superintendent

Portuondo or the office of the DOCS Inspector General.  The denial of

plaintiff's request was said to have been based upon both his disciplinary

record and the circumstances surrounding his brother's death.  The

record in this case is devoid of any evidence which would suggest that

either or both of these reasons were pretextual, and that instead

defendant Portuondo or others who participated in the decision-making

process acted out of malice or for some other improper reason with an

intent to inflict emotional harm upon the plaintiff by denying his request.

Absent proof of such an intent to inflict psychological distress, plaintiff

cannot satisfy the subjective requirement of the Eighth Amendment

24

conditions of confinement test.  *Butler v. Snyder*, 106 F. Supp.2d 589, 592 (D. Del. 2000); *see also Sanders*, 1987 WL 26872, at *2; *Boddie v. Coughlin*, 583 F. Supp. 352, 356 (S.D.N.Y. 1984).  Accordingly, to the extent that it rests on the Eighth Amendment plaintiff's claim is legally deficient, and subject to dismissal.

## 2.    Fourteenth Amendment

In some cases similar to those at bar, prisoners denied permission to attend funerals or make death bed visits have alleged that they were deprived of a recognized and protected interest without having been afforded procedural due process, in violation of the Fourteenth Amendment.  Plaintiff's complaint, as amended, appears to raise such a Fourteenth Amendment argument in connection with the denial of his request for permission to attend his brother's funeral.  *See* Amended Complaint (Dkt. No. 15) ¶ 54.

In order to assert a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must "first allege that he [or she] was deprived of a liberty or property interest."  *Verrone v. Jacobson*, No. 95 CIV. 10495, 1999 WL 163197, at *3-*4 (S.D.N.Y. Mar. 23, 1999) (citing*, inter alia*, *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729 (1975))*.  Only if

such a protected interest is at issue is the court required to evaluate whether the denial was the result of a denial of due process.  *Id.*, at \*4-\*5.

One potential source of such a protected interest is the Constitution itself.  The Constitution, however, does not confer upon prison inmates a protected right to attend functions such as the funeral of a family member. *See*, *e.g.*, *Verrone*, 1999 WL 163197, at \*5; *Allen v. Senkowski*, No. CIV. 95 CV 1499, 1997 WL 570691, at \*1 (N.D.N.Y. Sept. 11, 1997) (Pooler, D.J. & Scanlon, M.J.); *Green v. Coughlin*, No. 94 Civ. 3356, 1995 WL 498808, at \*1 (S.D.N.Y. Aug. 22, 1995).

A protected liberty or property interest sufficient to invoke the Fourteenth Amendment's procedural due process requirements may also be created by a state, either by statute or through some other means.  In this instance, however, the statutory provision which allows for release of a prison inmate under circumstances such as those now presented does not confer such an unqualified right, instead investing in prison authorities the discretion to grant or deny a request such as that made by the plaintiff.  *See* N.Y. Correction Law § 113.[12]  The DOCS directives through

---

[12]    That controlling statute provides, in relevant part, that

> [T]he commissioner of correctional services *may* permit any inmate confined by the

which that statutory authority is exercised similarly call upon the exercise of discretion in addressing such requests. *See*, *e.g.*, DOCS Directive No. 4206. Since under the relevant statute and regulatory scheme inmates do not possess an unfettered right to attend such events as funerals and death bed visits, *Boddie*, 583 F. Supp. at 356, the State has not, through those provisions, created a protected right which can only be denied after affording procedural due process. *See Verrone*, 1999 WL 163197, at *4-*5.

In sum, plaintiff's failure to establish the existence of a protected right or liberty interest, either under the Constitution or created by the State, proves fatal to any Fourteenth Amendment procedural due process claim which could be asserted based upon the circumstances now

_____

> department except one awaiting the sentence of death to attend the funeral of his or her father, mother, guardian or former guardian, child, brother, sister, husband, wife, grandparent, grandchild, ancestral uncle or ancestral aunt within the state, or to visit such individual during his or her illness if death be imminent . . . but the exercise of such power shall be subject to such rules and regulations as the commissioner of correctional services shall prescribe, respecting the granting of such permission, duration of absence from the institution, custody, transportation and care of the inmate, and guarding against escape.

N.Y. Correction Law § 113 (emphasis added).

presented.

      C.    <u>Mail Watch Claims</u>

In their motion defendants challenge the legal sufficiency of plaintiff's mail interference claims, arguing that their monitoring of Jackson's mail resulted from evidence providing a reasonable basis for prison officials to inspect his mail.

While it is true that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison[,]" *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S. Ct. 1861, 1877 (1979), their rights are both circumscribed and subject to legitimate penological concerns of prison officials. *United States v. Felipe,* 148 F.3d 101, 107 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998) and 525 U.S. 1059, 119 S. Ct. 628 (1998).  Consistent with these principles, prison inmates enjoy "those First Amendment rights that do not contravene prison regulations 'reasonably related to legitimate penological interests.'" *Felipe*, 148 F.3d at 108 (citing and quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)).

Acknowledging these well-established precepts, the Second Circuit has "ruled that the interception of [an inmate's] prison correspondence

28

does not violate that individual's First or Fourth Amendment rights if prison officials [have] 'good' or 'reasonable' cause to inspect the mail."  *Felipe*, 148 F.3d at 108 (citing *United States v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996), *cert. denied*, 519 U.S. 938, 117 S. Ct. 319 (1996) and 519 U.S. 955, 117 S. Ct. 373 (1996)).  Thus, for example, in *United States v. Workman*, the court found reasonable cause to review an inmate's outgoing correspondence based upon intercepted telephone conversations involving discussions between the prisoner and others regarding drug transactions and the commission of contract murders.  80 F.3d at 699.  Similarly, in *Felipe* interception of prison mail was approved by the court based upon information that the inmate in question was engaged in kiting, where letters intercepted revealed both unauthorized prison gang membership and activities, including recruitment, as well as the planning of other illegal acts, the court concluding that the

> DOC'S [sic] knowledge that Felipe was the leader
> of the Latin Kings, was actively recruiting new
> members, had violated prison regulations related to
> mail, and had written about the commission of
> illegal acts, such facts constituted reasonable
> cause to intercept [the inmate's] correspondence.

*Felipe*, 148 F.3d at 108.

In this case, as in *Workman* and *Felipe*, prison officials implemented

29

watches of plaintiff's mail only after determining, based upon information provided by credible sources, that plaintiff was engaged in mail violations and efforts to smuggle contraband and unauthorized packages into the facility.  On each occasion when the mail watch was initiated, DOCS officials were in possession of information which provided them with reasonable cause for outgoing mail interdiction.  I therefore recommend dismissal of a portion of count five of plaintiff's amended complaint which alleges a constitutional violation stemming from the interception of his prison mail.

### D.    Res Judicata

One element of plaintiff's amended complaint asserts interference by the defendants with the exercise of his religious beliefs.  Plaintiff attributes that interference on the part of defendants Portuondo, Annetts, Harris, Squillace and Goodman to retaliation for his having filed a civil rights action against them.  Defendants argue that in fact plaintiff's settlement of that prior action effectively precludes his maintenance of the religious exercise claims contained within the first count of his amended complaint.

The doctrine of *res judicata*, or claim preclusion, serves to prohibit a

party or someone in privity with that party from relitigating a claim which was or could have been raised in an action which resulted in the entry of a final judgment on the merits.  *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 414 (1980); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286-87 (2d Cir. 2002) (citing *Allen*).  The doctrine, which is judicially created, serves "to promote legally economy and certainty." *Amalgamated Sugar Co., LLC v. NL Indus., Inc.*, 825 F.2d 634, 639 (2d Cir. 1987) (citing *Expert Electric Co. v. Levine*, 554 F.2d 1226, 1232 (2d Cir.), *cert. denied*, 434 U.S. 903, 98 S. Ct. 300 (1977)).

To establish *res judicata*, which constitutes an affirmative defense, a party must prove that 1) the previous action resulted in an adjudication on the merits; 2) the prior suit involved the plaintiff or those in privity with him; and 3) the claims asserted in the instant action were, or could have been, asserted in the prior case.  *Allen*, 449 U.S. at 94, 101 S. Ct. at 414; *Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 285 (2d Cir. 2000).

The critical question now presented is whether the settlement achieved in the earlier action brought by the plaintiff can properly be regarded as an adjudication on the merits.  Unquestionably, a consent

31

judgment ordinarily qualifies as adjudication on the merits, for purposes of

*res judicata*.  As one authoritative source has noted,

> [i]n most circumstances, it is recognized that
> consent agreements ordinarily are intended to
> preclude any further litigation on the claim
> presented but are not intended to preclude further
> litigation on any of the issues presented.  Thus
> consent judgments ordinarily support claim
> preclusion but not issue preclusion.

18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac.

& Proc. Juris.2d § 4443 (2d ed. 2002) (footnote omitted).

    Settlement agreements, by contrast, do not in and of themselves

bear these attributes since "a settlement agreement by itself is effective

only as a contract."  *Id.* (footnote omitted).  This notwithstanding, under

certain circumstances, the settlement of an action may be preclusive in

the face of a subsequent action asserting related claims.  *Greenberg v.*

*Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir.

1992).  When *res judicata* is urged, based upon a settlement agreement,

"[t]he preclusive effect of a settlement is measured by the intent of the

parties to the settlement."  *Id.* (citing *May v. Parker-Abbott Transfer &*

*Storage Inc.*, 899 F.2d 1007, 1010-11 (10th Cir. 1990)).

    Careful review of the transcript of the settlement effectuated in the

prior action brought by the plaintiff makes it abundantly clear that by entering into it the parties intended to "settle any and all claims, causes of actions [sic] that the plaintiff [had] against DOCS arising out of [the] particular sets of facts [the parties had] been litigating for the last four days." Brown Decl. (Dkt. No. 81) Exh. F, at 5. In describing the settlement, plaintiff's *pro bono* counsel set forth conditions of the parties' agreement, under which plaintiff was to be permitted to participate in Jewish religious services, consistent with DOCS policies, and to otherwise practice his faith, consistent with legitimate penological concerns. *Id.*, at 4. After the settlement was discussed the court concluded by stating that "[t]he matter is declared settled upon the record", and judgment was thereafter entered. *Id.*, at 7.

It seems clear from these circumstances that plaintiff settled all claims against the DOCS arising out of the limitations placed on his ability to practice his religion. To the extent that those limitations were retaliatory in nature, in response to his having previously engaged in protected activity, as he now argues, that is a claim which could have been asserted in the prior action, even assuming that it was not. *See*, *e.g.*, *Latino Officers Assoc., Inc. v. City of New York*, No. 99 Civ.9568,

2003 WL 21437057, at *2-*3 (S.D.N.Y. June 16, 2003).  Plaintiff's failure to raise the issue of retaliation in the prior action effectively precludes his maintenance of such a claim in this case.

Undeniably, the entry of a prior judgment does not serve to extinguish claims which did not exist, and thus could not have been sued upon, at the time of filing of the prior action.  *Marvel*, 310 F.3d at 287.  A review of plaintiff's complaint in this action, however, reflects that all of the conduct ascribed by him as part of defendants' impingement upon his free exercise rights is alleged to have occurred prior to the time of the settlement of the prior action.  Under these circumstances, I recommend dismissal of plaintiff's religious free exercise and retaliation claims based upon *res judicata*.

E.   Procedural Due Process

_____Plaintiff's complaint, as amended, alleges due process violations with regard to the June 26, 1998 and July 21, 2000 disciplinary hearings conducted by defendant Cunningham, as well as in connection with a hearing held by defendant Gorelick on or about September 8, 2000.[13]

_____

[13]   Plaintiff's memorandum in opposition to defendants' motion also references a procedural due process deprivation stemming from an apparently brief period of SHU disciplinary confinement beginning on or about May 18, 1999.  *See* Plaintiff's Memorandum (Dkt. No. 90) at 20.  That incident, however, is nowhere

Defendants maintain that plaintiff's due process challenges regarding those hearings are not well taken.

The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the required protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S. Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the

_____

mentioned in plaintiff's complaint.  In any event, even assuming that plaintiff's procedural due process claim, as pleaded, was deemed to include that incident, it would be subject to dismissal as a matter of law.  The gist of plaintiff's complaint regarding that incident is that he was taken out of general population on May 18, 1999 and placed into SHU confinement without having been provided with a disciplinary hearing within seven days.  While it is true that the Fourteenth Amendment requires a meaningful and timely opportunity to be heard, the seven day hearing requirement is strictly one of regulation and is not enforceable in an action brought pursuant to 42 U.S.C. § 1983.  *See*, *e.g.*, *Duffy v. Selsky*, No. 95 Civ. 0474, 1996 WL 407225, at *8-*9 (S.D.N.Y. July 18, 1996).  In any event, since plaintiff's papers reveal that he was in SHU confinement only from May 18, 1999 until being released back into the general population until May 24, 1999, as a matter of law that encounter did not represent the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's procedural due process requirements.  *Frazier v. Coughlin*, 81 F.3d 313, 317-18 (2d Cir. 1996).  *See* Plaintiff's Statement pursuant to Local Rule 7.1(a)(3) (Dkt. No. 88) ¶ 7.

right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-70, 94 S. Ct. at 2978-83.  In reviewing the merits of an officer's decision, a court must only determine whether it is supported by some evidence – that is, "whether there is any evidence in the record that could support the conclusion reached by the [hearing officer]."  *Superintendent Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 2774 (1985).

### 1.   June 26, 1998 Hearing

The record before the court reflects that plaintiff received written notice of the impending hearing on June 23, 1998; was advised of but elected not to exercise his right to assistance; determined not to call any witnesses; and admitted four of the five charges set forth in the controlling misbehavior report.  Cunningham Decl. (Dkt. No. 81) ¶¶ 9, 11, 12; *id.* Exh. A, at 1-6; *id.* Exh. D, at 3-5.  Following the hearing, plaintiff received a written statement of the evidence relied upon and the reasons for Hearing Officer Cunningham imposing the resulting disciplinary sanctions, including the various factors considered by the hearing officer in making his determination.  *Id.* Exh. A, at 2.  The record also reflects that the finding of guilt was supported by at least some evidence in the record.

36

Cunningham Decl. *Id.* Exhs. A, D. Given these circumstances, plaintiff has failed to establish a due process violation growing out of that disciplinary proceeding.

        2.   June 30, 2000 Hearing

Plaintiff next complains of a disciplinary hearing conducted by defendant Cunningham on June 30, 2000 in connection with a misbehavior report issued a few days earlier. Amended Complaint (Dkt. No. 15) ¶ 36. Specifically, plaintiff alleges that he was denied his right to assistance and to submit evidence and call witnesses on his behalf in connection with that hearing. *Id.* The record now before the court, however, reflects that plaintiff initially waived his right to assistance with regard to that hearing. Cunningham Decl. (Dkt. No. 81) ¶ 23; *id.* Exh. B, at 6; *id.* Exh. C, at 2. Despite that waiver, plaintiff was nonetheless provided with assistance during the hearing for the limited purpose of contacting a potential witness, Lisa Oliver, outside of the presence of the hearing officer. *See id.* ¶ 23; *id.* Exh. B, at 23-24, 27-29; *id.* Exh. C, at 44-50. As for the denial of the right to call witnesses, the only witness implicated is Doreen Parisi, the Senior Mail and Supply Clerk, who had already been produced to testify during the hearing. Cunningham Decl.

37

(Dkt. No. 81) Exh. C, at 52-53.

Having carefully reviewed the record regarding the June 30, 2000 hearing I find no basis to conclude that his due process rights were denied.  Moreover I find, particularly in view of his acknowledgment to having made arrangements to receive a package while on package restriction, that the hearing officer's determination of guilt was supported by some evidence.  *Id.*, Exh. C, at 4-5.

### 3.   September 8, 2000 Hearing

_____The last disciplinary hearing which is the subject of defendants' motion was held on September 8, 2000 by defendant Gorelick.[14],[15]  *See* Gorelick Decl. (Dkt. No. 81) Exh. A.  That hearing was conducted to address a claim that plaintiff had attempted to arrange for the smuggling

---

[14]     In his complaint, plaintiff alleges that defendant Selsky affirmed the hearing on September 8.  Amended Complaint (Dkt. No. 15) ¶ 39.

[15]     Plaintiff's amended complaint also asserts due process violations arising out of a disciplinary hearing conducted in or about January of 2000 by defendant Squillace.  *See* Amended Complaint (Dkt. No. 15) ¶¶ 31-33.  Defendants' motion papers do not address plaintiff's allegations of due process violations growing out of that hearing.  That determination was subsequently reversed on appeal to defendant Selsky, and all reference to the charges was expunged from the plaintiff's record.  *Id.* ¶ 33.  It appears, however, that plaintiff was required to serve at least some SHU confinement resulting from that hearing, although the record is ambiguous as to the extent of that confinement.  *See id.*  Under these circumstances plaintiff is not foreclosed from pursuing a damage claim against Squillace, the hearing officer, alleging deprivation of due process.  *Walker v. Bates*, 23 F.3d 652, 658-59 (2d Cir. 1994).

of contraband and committed a correspondence procedures violation by authorizing and sending a letter, in code, requesting that the recipient deliver drugs to the prison, in return for $120. *See id.*, at 12. Plaintiff asserts that in connection with that hearing he was deprived of his rights to inmate assistance, to call witnesses and submit evidence in his behalf, and to have the matter heard and decided by an impartial hearing officer. Amended Complaint (Dkt. No. 15) ¶ 39.

The record before the court reflects that at the outset of the September 8, 2000 hearing plaintiff once again chose to waive his right to assistance. Gorelick Decl. (Dkt. No. 81) Exh. A, at 33 & Exh. B, at 2. The record also demonstrates that plaintiff was served with written notice of the charges against him, *see id.* Exh. B, at 1, and was allowed to present a defense, including to call five witnesses, three of whom were inmates. *Id.* Exh. A, at 8 & Exh. B. The resulting determination of guilt was based upon some evidence, and there is no basis in the record to conclude that defendant Gorelick was biased or partial.

It is true that Hearing Officer Gorelick denied plaintiff's request to call Lisa Oliver, the addressee of the letter soliciting the smuggling of drugs into the facility, as a witness, finding that to allow her to testify

would deter correctional goals.  Gorelick Decl. (Dkt. No. 81) Exh. A, at 3;

*id.* Exh. B, at 57-59.  That determination was reasonable and did not

deprive the plaintiff of the right to present a meaningful defense,

particularly in view of his admission that he wrote the letter which was the

subject of the hearing.  Accordingly I find no due process violation

associated with the September 8, 2000 hearing.

In sum, the due process violations alleged by the plaintiff in his

amended complaint and amplified somewhat in his opposition motion

papers lack merit as a matter of law, to the extent that they are addressed

in defendants' motion, the record disclosing no reason to conclude that a

reasonable factfinder could discern the existence of a procedural due

process violation.  I therefore recommend dismissal of that claim except

as relates to the claim against defendant Squillace arising from the

hearing conducted in January of 2000.

F.    Dismissal as Against Defendants Wright and Wilkins

In their motion defendants seek dismissal of plaintiff's claims against

Corrections Lieutenant Austin C. Wright and Corrections Sergeant D.

Wilkins, who are sued only based upon having authored misbehavior

reports leading to disciplinary proceedings against the plaintiff.

Defendants maintain that such conduct alone does not rise to a level of constitutional significance, particularly since those misbehavior reports grew out of prison officials' mail watch activities which, defendants argue, did not result in deprivation of plaintiff's constitutional rights.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor – there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of

41

the violation through a report or appeal, may have failed to remedy the

wrong; 3) the supervisor may have created or allowed to continue a policy

or custom under which unconstitutional practices occurred; 4) the

supervisor may have been grossly negligent in managing the subordinates

who caused the unlawful event; or 5) the supervisor may have failed to act

on information indicating that unconstitutional acts were occurring.

*Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*,

781 F.2d 319, 323-24 (2d Cir. 1986).

There is no indication in the record of any personal involvement on

the part of defendants Wright and Wilkins in the procedural due process

violations alleged.  The role of those two defendants appears to have

been limited to the issuance of the initial misbehavior reports, thereby

triggering disciplinary proceedings against the plaintiff.  The mere

issuance of a misbehavior report, even if false, does not alone give rise to

a constitutional violation.  *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.

1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988); *Jackson v.

Johnson*, 30 F.Supp.2d 613, 617-18 (S.D.N.Y. 1998).  Accordingly, I

recommend dismissal of plaintiff's claims against defendants Wright and

Wilkins based upon the fact that no reasonable factfinder could conclude

that they had personal involvement in the due process violations alleged
in plaintiff's complaint.

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action presents an amalgamation of
claims based upon events occurring at Shawangunk.  To the extent that
plaintiff's complaint articulates a cause of action under the First
Amendment to the United States Constitution, based upon the alleged
deprivation by defendants of his right to freely exercise his chosen
religion, such a claim is barred by *res judicata* since it was, or could have
been, asserted in a prior action against various DOCS officials at
Shawangunk, which action was settled on the merits, resulting in payment
of money by the DOCS to plaintiff and his attorney.  Plaintiff's mail access
claims are subject to dismissal on the merits based upon the fact that
defendants have established a reasonable basis for imposing mail
watches on the plaintiff's incoming and outgoing mail at the prison during
the relevant times.  Plaintiff's procedural due process claims are likewise
subject to dismissal as a matter of law, except with respect to the
January, 2000 hearing, based upon my finding that no reasonable
factinder could conclude that plaintiff was denied any procedural due

43

process rights.  I further find that plaintiff has failed to assert a cognizable constitutional violation stemming from the refusal of prison officials to allow him to leave Shawangunk to attend his brother's funeral in Brooklyn. Additionally, I find that the record fails to disclose a basis to find that defendants Wright and Wilkins were personally involved in the constitutional violations alleged in plaintiff's complaint.  Lastly, in light of my recommendation on the merits, I find it unnecessary to address defendants' claim of entitlement to qualified immunity.[16]  *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001); *Harhay v. Town of Ellington Bd. of Ed.*, 323 F.3d 206, 211 (2d Cir. 2003); *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)).

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 81) dismissing plaintiff's complaint be GRANTED, and that plaintiff's complaint in this action be DISMISSED, except as to the plaintiff's due process claim against defendant Squillace arising from a

---

[16]     Based upon the lack of information in the record regarding the January, 2000 hearing, the court is not positioned to address whether defendant Squillace is entitled to qualified immunity in the face of the plaintiff's due process claims stemming from that hearing.

44

disciplinary hearing conducted by him in January of 2000.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties by regular mail.

Dated:      March 3, 2006
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\ISSUES\civil rights\personal involvement\Jackson2.wpd

45